UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BARBARA LOPES,

        Plaintiff,

  - against -

FIRST UNUM LIFE INSURANCE COMPANY,

        Defendant.
-------------------------------------------------------------X

**MEMORANDUM AND ORDER**
09-CV-2642 (RRM)(SMG)

**MAUSKOPF, United States District Judge.**

      Plaintiff Barbara Lopes brings this action against Defendant First Unum Life Insurance Company under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, challenging Defendant's denial of disability benefits. (Compl. (Doc. No. 1) ¶¶ 1, 10.) Defendant counterclaimed, seeking judgment for collateral offset, *i.e.*, monies from collateral sources Plaintiff received as disability benefits. (Answer and Conditional Countercl. (Doc. No. 3) 2.) Before the Court are the parties' cross-motions for summary judgment. (Def.'s Mot. for Summ. J (Doc. No. 11) 1; Pl.'s Mot. for Summ. J. (Doc. No. 15) 1.) For the reasons below, the Court denies Lopes' motion for summary judgment, grants Defendant's motion for summary judgment and thereby dismisses Plaintiff's claims in their entirety, and denies with leave to renew Defendant's motion on its counterclaim for collateral offset.

## BACKGROUND

      The undisputed facts of this case are taken from Defendant's Local Civil Rule 56.1 Statement (Doc. No. 12), Plaintiff's Local Civil Rule 56.1 Statement (Doc. No. 16), and the Administrative Record ("A.R." (Doc. No. 20)). Plaintiff has expressly conceded all of the

material facts set forth in Defendant's Rule 56.1 statement, and those facts are taken in the light most favorable to Plaintiff.

Plaintiff reports that an unknown attacker assaulted her while she was returning home on February 5, 2005, throwing her to the ground, and causing her injury. (A.R. at 25.)[1] At the time, Plaintiff was a Vice President in the Compliance Department of Morgan Stanley, a sedentary position. (Def. 56.1 Stmt. ¶ 10; A.R. at 448.) Morgan Stanley provided disability insurance to its employees under a policy issued by Defendant (the "Plan"). (*Id.* at ¶ 2.) In July of 2005, Plaintiff filed a claim for long-term disability ("LTD") benefits under the Plan. (Pl. 56.1 Stmt. ¶ 6; Def. 56.1 Stmt. ¶¶ 10–11). Plaintiff's claim reported that the assault caused her back pain, "headache," Post-traumatic Stress Disorder (PTSD), high blood pressure, "anxiety with panic and agoraphobia." (Pl. 56.1 Stmt. ¶¶ 5–6; Def. 56.1 Stmt. ¶¶ 10–12.)

As applicable to Plaintiff's claim, a claimant is "disabled" under the Plan, and entitled to LTD benefits if, "because of injury or sickness[,] he cannot perform each of the material duties of his regular occupation." (*Id.* at ¶ 5.) LTD benefits are subject to a "mental illness limitation," according to which, subject to exceptions not applicable here, "benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments." (*Id.* at ¶ 6.)

On August 23, 2005, Defendant notified Plaintiff by letter that it had approved her claim for LTD benefits, noting that Plaintiff was "unable to work due to [PTSD], anxiety, and depression." (*Id.* at ¶ 12.) The letter noted also that Plaintiff's benefits were subject to the mental illness limitation and therefore will "not exceed 24 months of monthly benefit payments." (*Id.* at ¶ 14.) The letter asked Plaintiff to provide further information from her treating physician regarding her back condition. (*Id.* at ¶ 16.) Plaintiff's benefits were retroactive from August 6,

---
[1] On July 31, 2008, Defendant received an e-mail asserting that Plaintiff was not assaulted and that her claims were fraudulent. (A.R. at 1573-74.)

2005. (*Id.* at ¶ 14.) Therefore, LTD benefits for Plaintiff's mental illness would run until, at the latest, August 5, 2007. (*Id.*)

As the 24-month limit drew near, Defendant took steps to determine whether Plaintiff's disability was physical, in which case the limit would not apply. In April 2007, Defendant notified Plaintiff by letter that the 24-month limit would take effect in August 2007. (*Id.* at ¶ 26.) In the same letter, Defendant informed Plaintiff that LTD benefits would continue beyond August 2007 if her "physical diagnoses [were] determined to be disabling." (*Id.* at ¶27.) In May 2007, Dr. Marc Levinson, Plaintiff's pain management and rehabilitation physician, sent Defendant a report stating that Plaintiff's back condition, lumbar radiculitis,[2] restricted her from "lifting [more than] 5 pounds . . . bending . . . or prolonged sitting or standing." (*Id.* at ¶ 30.) Plaintiff's job duties did not meet these restrictions. (*Id.* at ¶¶ 23–24.) To perform its evaluation, Defendant engaged Nurse Kay O'Reilly; Dr. Neil McPhee, a specialist in physical medicine and rehabilitation; and Dr. Susan S. Council, a specialist in pain management and rehabilitation. (*Id.* at ¶¶ 31, 38, 44.) They disagreed with the restrictions set out in Dr. Levinson's May 2007 report, recommending a less restrictive set of physical limitations, which would not have prevented Plaintiff's return to work at her sedentary position with Morgan Stanley (*Id.* at ¶¶ 23–24, 33, 39, 45.) Dr. McPhee raised these conclusions with Dr. Levinson, and Dr. Levinson agreed that they were "reasonable." (*Id.* at ¶ 40.)

On September 17, 2007, Defendant closed Plaintiff's claim and terminated her benefits, informing her by letter that the 24-month mental injury limitation had run, that her "physical conditions [were] judged not be impairing," and that she had a right to an administrative appeal.

---

[2] Dr. Levinson based his diagnosis, in part, on MRI performed on June 1, 2005 and June 30, 2007 indicating that Plaintiff suffered from central disc herniation at L5/S1, with anterior thecal effacement and encroachment on the descending left S1 nerve root, and disc bulges with thecal sac effacement at L2/3 and L3/4. (Pl.'s 56.1 Stmt. ¶ 16(a); A.R. at 977–78.)

(*Id.* at ¶ 48.)  Plaintiff appealed Defendant's determination, contending that her back condition and the side effects of her pain medications combined to render her physically disabled and unable to return to work.  (*Id.* at ¶¶ 52, 55, 63, 66.)  Under the Plan, disabling side effects of medicine taken to treat a physical condition can constitute a "physical" disability even if those side effects themselves are cognitive or psychological. (*See id.* at ¶ 66; A.R. at 1169–70.)   Thus, if suffering from such a physical disability, Plaintiff could be eligible for benefits separate and apart from those limited by the policy's 24-month mental illness benefit.

Defendant evaluated Plaintiff's appeal through further independent analysis by four medical professionals, and communication with Plaintiff's doctors.  Defendant retained Dr. Kenneth Freundlich, an independent psychologist, to administer neuropsychological tests to gauge the effects of Plaintiff's various medications on Plaintiff's cognitive functioning.  (Def. 56.1 Stmt. ¶ 68.)  Plaintiff performed very poorly on the tests.  (*Id.* at ¶ 69.)  However, Dr. Freundlich concluded that Plaintiff's performance was caused by intentional "malingering," and not the side effects of Plaintiff's medication.  (*Id.* at ¶ 69.)  Plaintiff's treating psychiatrist, Dr. Sidney Fein, reviewed Dr. Freundlich's report, deemed it "thorough and professional," and stated that he was unaware of Plaintiff's claimed cognitive dysfunction.  (*Id.* at ¶¶ 76–77.)  Defendant upheld its previous determination to terminate LTD benefits because Plaintiff was not physically disabled, notifying Plaintiff by letter dated April 16, 2008 that "the claim records and testing provide no medical basis for restricted function of a physical nature that would preclude you from performing the material duties of your regular occupation because of your reported systems of back pain and cognitive deficits, relating to pain medication side effects."  (*Id.* at ¶¶ 73–74.)

Nevertheless, upon request by Plaintiff's attorney, Defendant agreed to provide an additional level of review, although the Plan did not require it.  (*Id.* at ¶ 82.)  Dr. Levinson

suggested that Plaintiff should have stopped taking her medication before being tested to determine the effects of the medication – a position he later abandoned. (*Id.* at ¶¶ 80–81, 89.) Defendant retained Dr. Peter Brown, a psychiatrist, who agreed with Dr. Freundlich's analysis of the test results, and spoke with Dr. Levinson about the analysis. Dr. Levinson noted that evidence of Plaintiff's malingering was "unequivocal." (*Id.* at ¶ 89.) Dr. Levinson said that Plaintiff's performance on the neuropsychological testing did not indicate cognitive deficits caused by the side effects of medication, and that Dr. Levinson based his conclusion that Plaintiff was disabled on Plaintiff's subjective reports. (*Id.* at ¶ 89.) By letter dated September 25, 2008, Defendant informed Plaintiff of its decision to uphold its initial determination to discontinue Plaintiff's benefits.

On June 22, 2009, Plaintiff filed this suit seeking reversal of Defendant's decision denying benefits for physical disability under the Plan. (*See* Compl. 3.) The Plan is an "employee benefits plan" governed by ERISA, and the Court has subject-matter jurisdiction under 29 U.S.C. §§ 1132 and 1003. *See Arnold v. Lucks*, 392 F.3d 512, 517–18 (2d Cir. 2004). Defendant has filed a counter-claim for collateral offset under the policy, based on Plaintiff's receipt of Social Security Disability Insurance ("SSDI") benefits.

## STANDARD OF REVIEW

### I. ERISA standard

ERISA permits a person denied benefits under an employee benefit plan to challenge the denial in federal court. *See* 29 U.S.C. § 1132(a)(1)(B); *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1213 (2d Cir. 2002). When a plan grants the administrator the authority to determine a claimant's eligibility for benefits, the reviewing court must apply a deferential standard. *See*

5

*McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 131–32 (2d Cir. 2008) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111–12 (2008)).

"Under the deferential standard, a court may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious, meaning without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 132–33 (internal quotation marks omitted). Where the plan administrator and the claimant offer rational, but conflicting interpretations of the plan, the administrator's interpretation must control. *See id.* "Nevertheless, where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *Id.* (internal quotation marks omitted).

When applying the deferential standard, courts must take into account any conflict of interest that the plan administrator may have. *See id.* at 133 (citing *Glenn*, 554 U.S. at 112); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–15 (1989). A conflict of interest is present where the plan administrator is also the payor of benefits. *See McCauley*, 551 F.3d at 133. While courts must consider any such conflict when reviewing claims denials, it remains "but one factor among many that a reviewing judge must take into account." *Id.* at 132–33.

The presence of a conflict of interest does not change the standard of review from deferential to *de novo*. *See id.* "Rather, a conflict of interest, like any relevant consideration, should act as a 'tiebreaker' when other considerations are closely balanced, particularly 'where circumstances suggest a high likelihood that it affected the benefits decision, including but not limited to, cases where an insurance company administrator has a history of biased claims administration.' " *Van Wright v. First Unum*, 740 F. Supp. 2d 397, 406 (S.D.N.Y. 2010) (quoting *Glenn*, 554 U.S. at 117); *see McCauley*, 551 F.3d at 133. A conflict of interest is " 'less

important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.' " *McCauley*, 551 F.3d at 133.

Finally, under the deferential standard, courts are generally "required to limit their review to the administrative record." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995). A court may look beyond the administrative record only if it finds good cause to consider other evidence. *See Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003).

## II.     Summary judgment standard

Under Rule 56 of the Federal Rules of Civil Procedure, a Court should grant summary judgment if there is "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2). In determining whether disputed issues of material fact exist, the court must draw all reasonable inferences in favor of the non-moving party. *See, e.g.*, *Shapiro v. N.Y. Univ.*, 640 F. Supp. 2d 411, 417–18 (S.D.N.Y. 2009) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Since ERISA review is ordinarily limited to the administrative record, and there is no right to a jury trial in ERISA actions, parties' motions for summary judgment can often "best be understood as essentially a bench trial on the papers with the District Court acting as the finder of fact." *Muller*, 341 F.3d at 124 (internal quotation marks omitted).

## DISCUSSION

The Plan here vests full discretionary authority with Defendant. "[M]agic words such as 'discretion' and 'deference' may not be absolutely necessary to avoid a [*de novo*] standard of review. . . . At the same time, [the Second Circuit has] noted that the use of such words is certainly helpful in deciding the issue." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251 (2d Cir. 1999) (internal quotation marks and citations omitted). The Plan states: "In making any benefits determination under [the Plan, Defendant] shall have the discretionary

authority both to determine an employee's eligibility for benefits and to construe the terms of [the Plan]." (A.R. at 58.) Plaintiff concedes that Defendant had discretionary authority under the Plan. (Pl's 56.1 Stmt. ¶ 1; Def. 56.1 Stmt. ¶ 3; Pl.'s Mem. in Supp. of Mot. for Summ. J. (Doc. No. 17) 1.) Therefore, the Court will apply the deferential standard of review, and overturn Defendant's determination only if it is arbitrary and capricious.

It is undisputed that Plaintiff suffers from various mental illnesses covered under the plan, and that she is in some amount of back pain that requires treatment with various medications. It is also undisputed that Plaintiff exhausted her LTD benefits for mental illness under the Plan, and is not entitled to further benefits for mental illness. The issue before the Court, therefore, is whether it was arbitrary and capricious for Defendant to conclude that Plaintiff's back condition and medication side effects did not render her physically unable to perform the material duties of her job at Morgan Stanley. As explained below the Court's review of the Administrative Record reveals substantial evidence in support of Defendant's conclusion.

An administrator is not required "automatically to accord special weight to the opinions of a claimant's physician," and may "credit reliable evidence that conflicts with a treating physician's evaluation." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 85 (2d Cir. 2009) (internal quotation marks omitted); *see also Demirovic v. Building Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006) (noting also that administrators may not "arbitrarily refuse to credit the reliable evidence put forth by a claimant," including reports of a claimant's treating physician). Even where subjective reports of pain are important in the diagnosis of an illness or injury, an administrator acts reasonably and within its discretion when it "accord[s] weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent

8

or unsupported claims of disability." *Id.* at 85 (finding administrator's reliance on objective data to deny benefits for fibromyalgia reasonable, though a fibromyalgia diagnosis depends largely on subjective reports); *see Suren v. Metro. Life Ins. Co.*, No. 07-CV-4439 (JG), 2008 WL 4104461, at *11 (E.D.N.Y. Sept. 26, 2008) ("[administrator] did not abuse its discretion when it based its opinion on objective tests and examinations, despite [plaintiff's] subjective complaints of fatigue and weakness.").

   I.   **Plaintiff's back condition**

A review of the Administrative Record clearly shows that Defendant acted within its discretion when it adopted the views of the medical professionals it retained to determine that Plaintiff's back condition was not disabling. Defendant retained three medical professionals for its initial review of Plaintiff's back condition, two of whom, Dr. McPhee, and Dr. Council, were experts in relevant specialty areas. According to these medical professionals, Plaintiff's physical ailments required restrictions that her job duties easily could accommodate.[3]

Most important, the record clearly demonstrates that Plaintiff's own physician, Dr. Levinson, was, at best, equivocal in assessing the conclusions of these professionals. While Dr. Levinson initially proposed restrictions that would have prevented Plaintiff from returning to work, he ultimately found the less-restrictive conditions and limitations put forth by Mrs. McPhee and Council to be "reasonable." (*See* Def. 56.1 Stmt. ¶ 40.) Indeed, this does not even amount to a "conflict" between Defendant's and Plaintiff's physicians' evaluations. In *Hobson*,

---

[3] Dr. McPhee, Dr. Council and Nurse O'Reilly agreed that Plaintiff was capable of "light duty," which means: "Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly . . . to move objects. Physical demand requirements are in excess of those for Sedentary Work." A.R. 1127. As a Vice President at Morgan Stanley, Plaintiff performs "sedentary work," i.e., "[e]xerting up to 10 pounds of force occasionally . . . and/or a negligible amount of force frequently . . . to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." U.S. Dep't of Labor, *Vice President, Financial Institution*, *in* Dictionary of Occupational Titles § 186.117-078 (4th ed., rev. 1991), *available at* 1991 WL 672652; *see* A.R. at 448.

9

confronted with reports from the insured's treating physicians that conflicted with the administrator's determination, the administrator "had a total of seven independent physicians . . . all of whom were Board-certified in one or more of the specialty areas relevant to [plaintiff's] diagnoses and conditions, review [plaintiff's] file." 574 F.3d at 90. Like the administrator in *Hobson*, Defendant "did not abuse its discretion by considering these trained physicians' opinions solely because they were selected, and presumably compensated, by" Defendant. *Id.* at 91. To the contrary, "it is customary for plan administrators to do so in evaluating ERISA claims," and Defendant is not bound to give "special weight" to Dr. Levinson's equivocal opinion. *Id.* at 90. Defendant did not arbitrarily ignore Dr. Levinson's report, but weighed his position and engaged in a meaningful dialogue with him. *See id.* (reasoning that an administrator's "repeated[] attempt[s] to contact" the insured's treating physicians make it unlikely that the administrator "arbitrarily refused to credit [the insured's] medical evidence."). Therefore, Defendant acted reasonably and within its discretion when it determined that Plaintiff's back condition was not physically disabling under the Plan.

## II. The side effects of Plaintiff's medications

Similarly, upon Plaintiff's administrative appeal and post-appeal, Defendant reasonably relied on six more medical professionals to conclude that Plaintiff's medications, combined with her back condition, did not render her physically disabled. *See id.* at 90.

Dr. Levinson suggested that Defendant failed to take into account the side effects of Plaintiff's medications in making its initial determination. (Def. 56.1 Stmt. ¶ 56.) To address those concerns, Defendant retained Dr. Philip Marion, an independent physician board-certified in physical medicine, rehabilitation, and pain management, to evaluate Plaintiff's record and Dr. Levinson's report. (*Id.* ¶ 58.) Dr. Marion agreed with Dr. McPhee's prior assessment, finding

"no objective impairment precluding the claimant working at least a full-time light duty occupational level." (*See* A.R. at 448, 1048.) Dr. Marion further noted the lack of "documentation from Dr. Levinson . . . that specifically detailed the claimant's cognitive deficits as a result of her prescribed medications," or "any documented objective neuropsychological testing supporting significant cognitive deficits for" Plaintiff. (A.R. at 1143.)

Although the burden to demonstrate a disability rested with Plaintiff under the Plan (*see* Def. 56.1 Stmt. ¶ 4), Defendant did not base its determination on the mere lack of data that Dr. Marion identified. Rather, Defendant engaged another physician, Dr. Laina D. Rodela, to determine whether it was possible that Plaintiff's medications could cause cognitive impairment. (*Id.* at ¶ 66.) She concluded that it was possible, and Defendant retained Dr. Freundlich to administer tests to determine whether Plaintiff's medications impaired her capacity in fact. (*Id.* at ¶ 68.) Lopes' results on the tests were dire:

> [U]pon formal testing, Ms. Lopes' overall intelligence is at the 1st Percentile (Full Scale IQ = 67), her memory is below the 1st Percentile (General Memory Index = 57), and her performance on virtually all neurocognitive measures is profoundly impaired.
>     . . . [I]t is evident that many of her test scores fell below the 1st Percentile.

(A.R. at 1302.) Dr. Freundlich concluded that Plaintiff's results were not credible:

> However . . . such profound impairment is inconsistent with her interpersonal presentation [as a well spoken, intelligent woman, who is able to articulate her thoughts without great difficulty], and this great disparity is due to her failure to exert a full and genuine effort on testing. This failure was clearly evidenced by her performance on various validity measures, which show that the current results cannot be taken at face value. Furthermore, these results strongly indicate that Ms. Lopes has intentionally attempted to portray herself as suffering from severe cognitive impairment, and therefore the current results cannot reliably be used to make any definitive statements about cognitive dysfunction. Rather, these results are indicative of malingering.

(*Id.*) Defendant asked Dr. Malcolm Spica, neuropsychologist and psychologist, to evaluate Dr. Freundlich's conclusions. (Def. 56.1 Stmt. ¶ 70.) Dr. Spica "concurred with Dr. Freundlich that

11

no reliable conclusions can be drawn [from the examination] as to the presence, severity or duration of any impairment." (*Id.* at ¶ 71.)

When Dr. Levinson again raised concerns about the side effects of Plaintiff's medication, Defendant undertook further review of Plaintiff's claim, retaining psychiatrist Dr. Brown. (*Id.* at ¶ 82.) Dr. Brown noted "the unequivocal evidence of florid symptom exaggeration," and elaborated:

> [T]he level of symptom severity reported with many test results in the first percentile (i.e. in the range found with only the most severely impaired institutionalized patients) is simply incompatible with the level of function demonstrated by the claimant.

(A.R. at 1549–50.) Bolstering Dr. Brown's conclusion, Dr. Spica noted that Plaintiff also failed dedicated and embedded tests of effort and symptom validity, indicating that Plaintiff failed to make a good faith effort. (Def. 56.1 Stmt. ¶ 86.) Dr. Spica remarked also that, on the Test of Memory Malingering, Plaintiff's performance

> ranked below the chance level. Put another way, she would have performed better on this task involving visual stimuli if she had taken the test without seeing the stimuli. That is, she made active decisions to choose the wrong answer.

(*Id.* at ¶ 87.)

Substantial evidence in the Administrative Record, therefore, supports Defendant's determination that the side effects of Plaintiff's medication, combined with her back pain, did not render her physically disabled. Given the evidence of claim exaggeration, Defendant acted reasonably in looking for objective evidence to support Plaintiff's claim. *See Hobson*, 574 F.3d at 88.

Here, too, Plaintiff's treating physicians did not quarrel with the independent neuropsychological testing and its results. Dr. Levinson did not dispute the findings of that testing and said they were interpreted properly. (Def. 56.1 Stmt. ¶ 89-90). Dr. Fein, Plaintiff's

12

treating psychiatrist, acknowledged that the testing was "thorough and professional" (*Id.* ¶ 76.) and that he was unaware of any cognitive dysfunction on the part of Plaintiff. (*Id.* ¶ 90)

Instead of attacking the results, Plaintiff, in her opposition to the instant motion, suggests that this testing caused Defendant's overall assessment of her claim to become "strangely misdirected." However, as the Administrative Record clearly shows, Defendant demonstrated prudence in the exercise of its discretion to determine whether Plaintiff suffered from any cognitive defects due to medication. Indeed, Dr. Levinson himself repeated told Defendant that his opinions regarding Plaintiff's inability to work were based on Plaintiff's own subjective reports. (*Id.* at ¶¶ 39-40, 56-56, and 89; A.R. 977). As such, Dr. Levinson agreed that neuropsychological testing was a proper course of action.

Claims administrators need not accept these subjective complaints, even if a treating physician does. *Maniatty v. UnumProvident Corp.,* 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd*, 62 Fed. Appx. 413 (2d Cir. 2003), *cert. denied*, 124 S. Ct. 431 (2003) ("it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator"); *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers ... must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)".)

Rather, "it is not unreasonable for ERISA plan administrators to accord weight to objective evidence ... in order to guard against fraudulent or unsupported claims of disability[.]" *Hobson,* 574 F.3d at 88. Guarding against fraud was no mere hypothetical in this case, given the

undisputed findings that Lopes engaged in "persistent and deliberate exaggeration" of her complaints in the neuropsychological testing (Def. Rule 56.1 Stmt. ¶ 89). *See Straehle v. INA Life Ins. Co. of N.Y.*, 392 F. Supp. 2d 448, 460 (E.D.N.Y. 2005) ("The Court finds that Straehle is not a credible source of evidence regarding the extent of her pain and impairments").

Moreover, First Unum received an e-mail during its claim review warning that Plaintiff was committing fraud:

> "barbara lopes is scamming you for disability insurance. she lied about being mugged. this is a true case of insurance fraud if i ever saw one. there is absolutely nothing wrong with her. please do not let her get away with this."

(AR 1574). The Court fails to see how any of the efforts regarding Plaintiff's neuropsychological tests were, in any way, "misdirected" as Plaintiff claims.

### III. Failure to conduct a physical examination

Plaintiff complains that Defendants never conducted a physical examination of Plaintiff. The Court finds this decision was reasonable in light of the nature of Plaintiff's complaint of cognitive disability secondary to medication, and the nature and scope of the independent review and testing conducted with regard to Plaintiff's claim. Plaintiff does not suggest in any way why such an examination is necessary, or what it could likely produce to support her claim over and above that which her own treating physicians and the many experts retained by Defendant had already determined. *Wagner v. First Unum Life Ins. Co.*, 2003 WL 21960997, *5 (S.D.N.Y. 2003), *aff'd*, 100 Fed.Appx. 862 (2d Cir. 2004), *cert. denied*, 543 U.S. 958 (2004) (rejecting argument "that First Unum's determination was arbitrary and capricious because she was never subject to an IME"); *Scannell v. Metro. Life Ins. Co.*, 2003 WL 22722954, *5 (S.D.N.Y. 2003) ("the record fails to indicate that an independent medical examination was necessary to assess Scannell's claim"); *Kocsis v. Standard Ins. Co.*, 142 F.Supp.2d 241, 254-55 (D. Conn. 2001) ("it

is not *per se* unreasonable for Standard to deny the plaintiff benefits without requesting an independent medical examination, in light of Standard's file review").

Moreover, the "treating physician rule" has been rejected in ERISA cases. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003) ("we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation"); *Hobson*, 574 F.3d at 89-90 (rejecting contention that "MetLife gave undue weight to the opinions of the independent physicians it consulted ... by affording more weight to those consultants' opinions than to those of Hobson's treating physicians.)

## IV. SSDI Determination

Plaintiff argues that her receipt of Social Security Disability Insurance ("SSDI") benefits suggests that Defendant's determination that Plaintiff was not physically disabled was arbitrary and capricious. Plaintiff's argument fails for three reasons. First, nothing in the record explains *why* Plaintiff is receiving SSDI – whether, for example, Plaintiff receives benefits for mental disability, physical disability, or even for the disability of another on whom Plaintiff relies for support. Second, Plaintiff's receipt of SSDI was not known to Defendant at any point during Plaintiff's initial claim determination, appeal or post-appeal, and the Court, therefore, will not consider it. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995). Finally, even if Plaintiff is receiving SSDI for physical injury, the Court concludes that Defendant's decision nonetheless is supported by substantial evidence in the record. While a Social Security Administration ("SSA") determination that a claimant is eligible for SSDI is "one piece of evidence," it is "far from determinative." *Billinger v. Bell Atl.*, 240 F. Supp. 2d 274, 285

(S.D.N.Y. 2003); *see Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443 (2d Cir. 1995). Ultimately, the question of whether or not a claimant is disabled must be judged according to the terms of the Plan and not according to the SSA's definition. *Billinger*, 240 F. Supp. 2d at 285. Here, the Court has identified sufficient evidence in the record supporting Defendant's decision that a contrary SSA determination does not render Defendant's decision unreasonable. *See id.*; *Van Wright v. First Unum*, 740 F. Supp. 2d 397, 404–05 (S.D.N.Y. 2010).

## V. Conflict of the Claims Administrator

Plaintiff correctly notes, but does not argue as a ground for judgment in her favor, that as claims administrator and payor, Defendant has a conflict of interest. As the Supreme Court has held, a court must balance a variety of factors to determine the reasonableness of the administrative determination in such circumstances. *Glenn*, 554 U.S. at 112. In doing so here, any conflict it in no way undermines the reasonableness of Defendant's determination. Plaintiff has not identified, and the Court has not found, any of the procedural irregularities, for example, conflicting explanations, lost files, or undocumented decisions, that courts have used to find an abuse of discretion. *See, e.g.*, *McCauley*, 551 F.3d at 135–38; *Diamond v. Reliance Standard Life Ins.*, 672 F. Supp. 2d 530, 536–38 (S.D.N.Y. 2009). Moreover, the uncontroverted record clearly demonstrates that Defendant paid Plaintiff the maximum under the policy for her psychiatric benefits, and, after significant review and testing by multiple professionals, Defendant's conclusions that Plaintiff was not disabled, could return to work with reasonable restrictions, and was malingering were well-founded and documented. Moreover, these conclusions were found to be reasonable by Plaintiff's own treating physicians. After balancing all of the factors as required, any conflict disappears "to the vanishing point" in light of Defendant's actions, all of which indicate a careful, reasoned analysis of Plaintiff's claims. *See*

*McCauley*, 551 F.3d at 133. The Court finds, therefore, that Defendant did not abuse its discretion in determining that Plaintiff was not physically disabled.

## VI. Counterclaim for collateral offset

The Plan explained that Defendant would "deduct other income benefits" from Plaintiff's LTD benefit award. (Def. 56.1 Stmt. ¶ 7.) The Plan defines "other income benefits" to include "[t]he amount of disability or retirement benefits under the United States Social Security Act . . . payable as a result of the same disability for which [the Plan] pays a benefit," such as Social Security Disability Insurance ("SSDI") (A.R. at 70; *see* Def. 56.1 Stmt. ¶¶ 8–9.) The Plan requires generally that estimated "other income benefits" be deducted from LTD benefits automatically. (A.R. at 70–71.) An insured may, however, elect to receive full LTD benefits, apply for "other income benefits," and promise to "repay . . . any overpayment caused by an award of" SSDI or "other income benefits." (*Id.* at 71; Def. 56.1 Stmt. ¶ 9.)

In the August 23, 2005 letter notifying Plaintiff of her approval for LTD benefits, Defendant explained also that estimated "other income benefits" would offset her LTD benefits, unless she made the election. (A.R. at 146.) Plaintiff elected to receive full LTD benefits, and to that end signed a writing called "Disability Payment Options / Reimbursement Agreement." (*Id.*) The writing explained that Plaintiff could receive LTD benefits "with no reduction for" SSDI or "other income benefits" if she agreed to "repay any overpayment incurred as a result of receiving any other benefits from those sources specified in the [Plan]." (*Id.*) Plaintiff promised "to pay the insurer any overpayment resulting from [her] receipt of benefits from other sources, as outlined in [the Plan]" within 30 days of receipt. (*Id.*) In August 2008, Plaintiff received an SSDI benefit award retroactive to September 2006. (Def. 56.1 Stmt. ¶ 97.)

17

An ERISA plan administrator may bring a civil action "to obtain . . . appropriate equitable relief" and "to enforce . . . the terms of the plan." 29 U.S.C. § 1132(a)(3)(B). Such equitable relief includes actions to recover benefits that have been offset by payments from third-parties. *See Fortune v. Grp. Long Term Disability Plan for Emps. of Keyspan Corp.*, 391 F. App'x 74, 80 (2d Cir. 2010); *Van Wright*, 740 F. Supp. 2d at 405; *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 321 (S.D.N.Y. 2009). Specifically, plan administrators may recover benefits that are retroactively offset by an award of SSDI benefits. *See Unum Life Ins. Co. v. Lynch*, No. 04-CV-9007 (CLB), 2006 WL 266562, at *3 (S.D.N.Y. Jan. 31, 2006).

Here, it is undisputed that the Plan and Plaintiff's election require Plaintiff to repay any SSDI benefits she received "as a result of the same disability for which" she received LTD benefits under the Plan. (A.R. at 70.) Although it is undisputed that Plaintiff received SSDI benefits, more information is necessary as to whether the benefits were "payable as a result of the same disability," as required under the Plan. (*See* Pl.'s Mem. in Supp. 3 n.1 ("[W]e have no evidence of the rationale for the Social Security award.").) Defendant has not offered any interpretation of the "same disability" language in the Plan, nor has Defendant offered any other details of the SSDI benefit award beyond the mere fact of its receipt. *See Bacquie v. Liberty Mut. Ins. Co.*, 435 F. Supp. 2d 318, 328, 330 (S.D.N.Y. 2006) (reviewing administrator's interpretation of similar Plan language). The amount of Plaintiff's SSDI benefit does not appear in the record. Therefore, the Court cannot, on this record, determine if offset is appropriate, and if so, in what amount.

## CONCLUSION

For the reasons above, Defendant's conduct was not arbitrary or capricious when it determined that Plaintiff was not physically disabled under the Plan. Therefore, Plaintiff's

motion for summary judgment is DENIED in its entirety. Defendant's motion for summary judgment is GRANTED, and Plaintiff's claims are DISMISSED in their entirety. As to Defendant's counterclaim for collateral offset, Defendant's motion for summary judgment is DENIED at this time without prejudice to renew.

SO ORDERED.

/S/

Dated: Brooklyn, New York
      March 30, 2011

_____
ROSLYNN R. MAUSKOPF
United States District Judge